## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GUARDIAN FIRE TESTING )
LABORATORIES, INC., a Nevada )
corporation )
)
      Plaintiff, )   CIVIL ACTION NO. _____
v. )
) JURY TRIAL DEMANDED
JOSHUA SOBOTA, individually as a )
Pennsylvania resident; DUSTIN TERHORST, )
individually as a Pennsylvania resident; )
BLUEOTTER, INC., a Pennsylvania )
corporation; and COMMONWEALTH )
ASSURANCE, LLC, a Pennsylvania limited )
liability company )
)
      Defendants.

## COMPLAINT IN LAW AND EQUITY

Plaintiff, Guardian Fire Testing Laboratories, Inc. ("Guardian"), by and through its undersigned counsel, files this Complaint in Law and Equity against Defendants, Joshua Sobota ("Sobota"), Dustin Terhorst ("Terhorst"), BlueOtter, Inc. ("BlueOtter"), and Commonwealth Assurance, LLC ("Commonwealth Assurance"), collectively "Defendants", and avers as follows:

## NATURE OF THE ACTION

1.    This is an action brought by Guardian against the Defendants arising out of breaches of various duties and contracts related to the provision of services and business operations for fire testing, certification, and field labeling. By this action, Guardian seeks injunctive relief, compensatory damages, punitive damages, and attorneys' fees for, among other claims, (i) breach of covenant not to disclose or competitively use confidential information; (ii) breach of covenant not to compete; (iii) breach of covenant not to solicit customers and employees; (iv) misappropriation of trade secrets pursuant to the United States Defend Trade

1

Secrets Act and Pennsylvania Uniform Trade Secrets Act; (v) violation of the United States Computer Fraud and Abuse Act; (vi) conversion; (vii) intentional interference with existing and prospective business relations; (viii) civil conspiracy; (ix) fraud; and (x) unjust enrichment.

## PARTIES

2.  Guardian is a Nevada corporation that was incorporated on February 1, 1994 with a registered address of 3773 Howard Hughes Parkway, Suite 500S, Las Vegas, Nevada 89169. Its principal place of business is located at 480 Hinman Avenue, Buffalo, New York 14216.

3.  Sobota is an adult individual with a residential address of 216 Oak Lane, Greensburg, Pennsylvania 15601. Upon information and belief, Sobota is the President and CEO of BlueOtter and Commonwealth Assurance, and retains ownership interests therein.

4.  Terhorst is an adult individual with a residential address of 1124 Monastery Drive, Latrobe, Pennsylvania 15650. Upon information and belief, Terhorst is the Director of Finance for BlueOtter and Commonwealth Assurance, and retains ownership interests therein.

5.  BlueOtter is a Pennsylvania corporation that was incorporated on April 16, 2014 with a registered address of 1124 Monastery Drive, Latrobe, Pennsylvania 15650, which is Terhorst's residential address. Upon information and belief, its principal place of business is located at 135 W. Pittsburgh Street, Greensburg, Pennsylvania 15601.

6.  Commonwealth Assurance is a Pennsylvania limited liability company that was incorporated on March 9, 2018 with a registered address of 102 Colbaugh Road, Trafford, Pennsylvania 15085.

## JURISDICTION AND VENUE

7.      The United States District Court for the Western District of Pennsylvania has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, relating to a dispute arising under the laws of the United States.

8.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).  Complete diversity exists between the Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside and do business in this District, a substantial part of the events giving rise to the claims occurred in this District, and the contracts or agreements that are the subject of the dispute are governed by the law in this District.

10.      Venue is also proper pursuant to the terms of the Service Agreement more fully described herein that is a valid agreement between the parties and the enforceability of which is part of the subject matter of this dispute. In relevant, the Service Agreement states:

> 13. **Applicable Law and Forum.** The parties hereto agree that this Agreement will be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania. The parties hereto agree that the Court of Common Pleas of Allegheny County, Pennsylvania and the United States District Court for the Western District of Pennsylvania in Pittsburgh, Pennsylvania shall be the proper forum and venue for any and all disputes arising hereunder. Any and all objections thereto are hereby waived by the parties hereto.

(See **Exhibit 3**).

## FACTUAL BACKGROUND

### Guardian's Business

11.      Guardian is a corporation that provides fire testing, fire certification, field labeling, and evaluation services for building products, solid fuel-burning appliances, chimney liners, adhesives, and record protection equipment. Guardian tests to UL, ASTM, NFPA, CSA

and ULC test standards for timed fire endurance, flame spread, safety, and efficiency of products and materials. Guardian is accredited to ISO 17025 as a fire testing laboratory, ISO 17020 as an inspection agency, and ISO 17065 for product certification.

12.     Guardian services customers from state to state throughout the United States and, to a certain extent, internationally.

13.     Guardian's fire testing and certification program consists of an independent testing laboratory devoted to the business of providing impartial testing for a variety of building products used in residential and commercial construction, such as fire door assemblies, adhesives, floor/ceiling assemblies, and wall assemblies.  Based on the applicable standards pertaining to each product, Guardian tests the products manufactured by other businesses in its laboratory using regulated fuel flame sources for ignition to determine whether the products comply with the fire rating standards.  If the products are being tested for application into Guardian's Product Certification program and they meet the test standards, an application for acceptance into the Program will be reviewed.  Products accepted in to the Program must meet those requirements. After acceptance, the recipient of the certification is permitted to use the Guardian mark on the certified product offered for public sale.

14.     Guardian's field labeling program provides the service of on-site evaluations for three components of the fire door assembly (opening protectives)—doors, door frames, and protective plates to healthcare facilities, schools, hotels, commercial facilities, government buildings, apartment buildings, and other private and public buildings. The design, construction and materials are analyzed and evaluated by Field Labeling Technicians according to U.S. fire testing standards, such as UL 10B, in order to determine their time rated fire endurance status—20, 45, 60, 90, or 180 minute labels and smoke labels where required. Door assemblies also may

be evaluated and labeled for their smoke barrier status. These labels are recognized by building code inspectors and other Authorities Having Jurisdiction ("AHJ").

15.     These labels need to be re-applied over time by Guardian's Field Labeling Technicians, so the relationships with its clients are recurring and well-established.

16.     Guardian is also a third-party evaluation agency that conducts in-service evaluations for fire-resistant products, building materials, record protection equipment, and other products to ensure that they comply with the applicable standards.

17.     Guardian's business generates over $2 million in sales on average each year, with the Field Labeling Division comprising over $1.6 million of sales, approximately 80% of the company's total revenue. If the Field Labeling Division was eradicated, the company may no longer be operational and may have to be dissolved or file for bankruptcy protection.

18.     Guardian's customers consist of door manufacturers and distributors, door repair and inspection service providers, manufacturers of door hardware and repair kits, end users of products with missing labels, and AHJ officials who observe missing labels during inspection. These customers have worked with Guardian for many years and have well-established relationships.

19.     Guardian has a confidential client list of specific entities with which it conducts business, which is not known or disclosed to the public. It has taken significant time, effort, and expense to develop this extensive base comprising several thousand customers.

20.     In order to achieve a necessary profit margin on each job, a detailed, internal cost-benefit analysis is performed by Guardian using a pricing formula to determine the amount of expenses and revenue associated with each job. There are numerous calculations and categories involved in this process, which would not be known or easily determined by anyone outside the

company. This Formula was created by Steve Zewe ("Zewe"), the Supervisor of Guardian's Field Labeling Department and Guardian's Director of Business Operations, in a confidential and proprietary format and program.

21.     There is confidential and proprietary information contained in the Guardian-invented pricing formula (the "Formula") which is utilized to produce a precise quote that provides value to the client while procuring necessary profit for the company. The calculations of the various components comprising the quote have been improved and perfected over time by Guardian's Field Labeling Department to ensure that the maximum necessary profit margin is achieved on every job.

22.     Guardian's Formula is only known by Guardian's Board of Directors and management personnel in the Field Labeling Department who are prohibited from disclosing this information to employees, clients, or the public at large.

23.     Management personnel in the Field Labeling Department plan and schedule the logistics and travel for the Field Labeling Technicians on each job. The confidential and proprietary Formula is not provided to the Field Labeling Technicians, nor are they involved in preparing the quotes. The Field Labeling Technicians are simply advised where to go and how many products need to be inspected and labeled.

24.     The quotes provided to Guardian clients do not include a breakdown of the calculations used in the Formula to arrive at the final quoted quantities. Each time a client has asked for this information, or for Guardian to itemize its quotes, Guardian informs them that the pricing structure and formulas are proprietary and confidential and are not divulged to the public. This information has never been divulged to a client, nor can it be found in the public domain.

25.     Despite having lost clients over this policy in the past, Guardian believes that taking all appropriate measures to safeguard its confidential and proprietary information is more important to the business in the long-term.

26.     The Formula created by Zewe is responsible for the significant increase of Guardian's Field Labeling Division revenue in recent years. It is the cornerstone of the Field Labeling Division's success.

27.     If other competitors gained access to the Formula and utilized it to determine how Guardian prices each job in order to undercut Guardian's quotes to clients, Guardian's field labeling business would be destroyed. Since this department comprises 80% of the company's total revenue, the consequences for Guardian would be fatal.

### Employment of Joshua Sobota

28.     On or about December 1, 2008, Guardian hired Sobota as a Field Labeling Technician. Sobota went through training provided by Guardian to learn all of the applicable codes and standards and how to inspect and analyze various components of products to ascertain whether they complied with applicable codes and standards.

29.     Per the terms of his employment with Guardian, Sobota executed an Ethics and Confidentiality Agreement ("ECA"), which states in relevant part:

> 1. Impartiality and Accuracy of Work: …Each person shall exercise due care to preserve records and information as "Business Confidential." This means any information belonging to [Guardian] or its customers may be released by an employee or a subcontractor only after prior written consent of the customer and [Guardian] management, with the exception that when such a release is ordered by an agency of law enforcement, [Guardian] employee shall comply.
>
> *          *          *
>
> 7. Any [Guardian] employee found to be in non-compliance of ECA shall be subject to disciplinary action, up to and including dismissal. A subcontractor in non-compliance will face suspension/termination of the contractual relationship with [Guardian].

7

(See the ECA attached hereto as **Exhibit 1**).

30.     Sobota soon became a very competent and experienced Field Labeling Technician who travelled extensively and excelled in the field labeling business. For many years, he was Guardian's most motivated and valuable Field Labeling Technician, and he was sufficiently rewarded for his efforts. As a result, Guardian and Sobota had a mutually-beneficial working relationship.

31.     Outside of his employment with Guardian, Sobota had a penchant for developing new technologies to assist companies in streamlining and organizing their businesses.

32.     In 2014, Sobota cultivated the idea of creating an asset tracking system through mobile app technologies. This system was intended to help businesses with a significant amount of inventory keep track in real time of how many products it had, when they were being used, by whom they were being used, and where they were being used. For example, the program could be sold to a hospital to assist in tracking the number of beds it had, where each bed was located, and by whom each bed was being used at any given time. The result was intended to help businesses with inventory logistics, increase efficiency, and decrease the amount of resources used to track inventory and assets.

### Sobota Establishes BlueOtter

33.     Sobota incorporated BlueOtter on April 16, 2014 under the laws of the Commonwealth of Pennsylvania to pursue his asset-tracking technology business while still continuing to work as a Field Labeling Technician for Guardian for the next two (2) years.

34.     In or about August of 2016, Sobota represented to Guardian that he wanted to develop the asset-tracking technology on a full-time basis, and he ceased working for Guardian after 8 years to become the President and CEO of BlueOtter.

35.    At the time Sobota ceased working for Guardian, he represented to Guardian that BlueOtter did not have any competing business interests with Guardian, as BlueOtter was involved in the technology industry and Guardian was involved with the fire testing and evaluation industry.

36.    Sobota obtained numerous investors to sponsor his new business and created a board of directors and officers for BlueOtter. Sobota hired Dustin Terhorst as the Director of Finance who is believed to have familial ties to Sobota. Terhorst was in charge of all finances and accounting for BlueOtter.

37.    Upon information and belief, Sobota did not fully develop the asset-tracking technology to market to other businesses as represented to Guardian, and he had mounting expenses while still remaining in the pre-revenue stage of business initiation. Sobota soon realized that he needed to revise his business strategy.

### The Service Agreement

38.    In the Fall of 2016, Sobota and Terhorst contacted Guardian and represented that they were interested in doing some consulting work for Guardian through BlueOtter. Guardian expressed an interest in learning more about a potential business relationship with Sobota and Terhorst.

39.    Sobota and Terhorst offered some limited initial financial and field labeling services for Guardian on a trial basis to determine what services could be provided. Guardian paid them for said services.

40.    On February 6, 2017, Sobota and Terhorst issued a proposal to Guardian through BlueOtter to provide accounting and payroll services, field labeling process services, field labeling training services, document management services, technology support services, internal

and external communication and marketing services, and overall technology and procedural integration services (the "Proposal"). (See the Proposal attached as **Exhibit 2**).

41.     The Proposal indicated that Terhorst would provide accounting and payroll services to Guardian for 100 hours per month, which included access to Guardian's business accounts, payroll, accounts payable, accounts receivable, and the company's overall revenue.

42.     Sobota was to provide field labeling process services, field labeling training services, interaction with clients to assist with quotes, and overall technology and procedural integration oversight for approximately 40 hours per month, while being paid $35 per hour to train Field Labeling Technicians as needed.

43.     The remaining marketing and communication services were to be provided by another employee of BlueOtter.

44.     In exchange for these services, Sobota and Terhorst proposed a contract price of $189,750.00 per annum to be divided into equal payments of $15,812.50 over 12 months.

45.     Such consideration would constitute most, if not all, of BlueOtter's total revenue, enabling Sobota and Terhorst to be paid.  Accordingly, Sobota and Terhorst were genuine and direct beneficiaries of the Proposal and resulting Agreement.

46.     Guardian was hesitant to enter into a contract that would give an outside party access to confidential and proprietary information about the business, such as financials, customer lists, accounting processes, and Field Labeling Department processes, including the Formula. However, Guardian was hopeful that the arrangement would benefit the parties— Guardian's processes would become more streamlined and organized while providing a business opportunity to Sobota, with whom it had a prior working relationship.

47.     Guardian decided that it would provide Sobota and Terhorst with a temporary agreement of one (1) year to gauge the success of the arrangement, as long as express confidentiality, non-compete, and non-solicitation provisions were included and agreed to by Sobota and Terhorst, the primary agents and representatives of BlueOtter.

48.     After the negotiation of these important and material terms and conditions between Guardian, Sobota, and Terhorst, the parties executed a Service Agreement on February 22, 2017 (the "Agreement").  (See the Service Agreement attached as **Exhibit 3**).

49.     The Agreement sets forth the scope of services by BlueOtter, the Contractor, for Guardian, the Company, as accounting/payroll services, field labeling assistance, technology integration services, and project/document management assistance. (**Exhibit 3, ¶ 1**).

50.     The relevant terms of the Agreement are as follows:

3.  **Term and Renewal.** Company agrees to engage Contractor, and Contractor agrees to provide Services, as of the date consistent herewith *until February 22, 2018* unless this Agreement is renewed or revised in writing by the parties hereto.

4.  **No Conflict and Authorization.** Contractor certifies that Contractor has no outstanding agreement or obligation or other agreement that conflicts with any term or condition of this Agreement or that would preclude or restrict Contractor from complying with the terms and conditions hereof. Contractor further certifies that Contractor is authorized to execute this Agreement and provide the Services contemplated hereunder.

*          *          *

6.  **Confidentiality.** *Contractor agrees to regard as highly confidential all information communicated to or received by Contractor in the course of or in connection with the provision of Services*, whether received from Company or any agent, representative, employee, or contractor of Company. *Contractor agrees to safeguard and maintain the confidentiality of all such information and agrees to not to make any oral or written disclosure without the express written consent of Company. This restriction applies to all information related, directly or indirectly, to Company's business, operations, affairs, and customers and shall survive this Agreement for a term of one (1) year after the expiration hereof…*

…This Paragraph 6 shall be deemed to be in addition to, and not in lieu of, any other written confidentiality agreement executed by the parties hereto and shall not be construed to limit Company's right to pursue legal and equitable action against Contractor for any breach.

*Contractor acknowledges and agrees that the Company would be irreparably damaged if any provision of this Paragraph 6 is not performed or adhered to by Contractor* in accordance with the specific terms hereof or is otherwise breached. Accordingly, it is agreed that the *Company shall be entitled to an injunction or injunctions to prevent breaches of this Paragraph 6 by Contractor and shall have the right to specifically enforce this Paragraph 6* and the terms and provisions hereof against Contractor in addition to any other remedy to which the Company may be entitled hereunder, whether at law or in equity.

7. **Non-Competition and Non-Solicitation.** Contractor hereby covenants and agrees as follows:

(i) Contractor and *Contractor's agents and representatives shall not*, directly or indirectly, during the term of this Agreement and any renewal or extension hereof, *initiate contact with, solicit the trade of, engage with, or otherwise do business with any customer or prospective customer of the Company* other than on behalf of, and for the benefit of, the Company. Contractor further agrees that, for a period of one (1) year following the expiration of this Agreement, Contractor and *Contractor's agents and representatives shall not, directly or indirectly, initiate contact with any customer or prospective customer of the Company to provide any product or service competitive with that of the Company*. Without limiting the scope of the foregoing in any away, Contractor agrees that Contractor and *Contractor's agents and representatives shall not*, during the term of this Agreement and for a period of one (1) year following the expiration of this Agreement, *directly or indirectly, solicit, induce, or encourage any customer or prospective customer of the Company to terminate or limit any relationship with the Company, refrain from entering into a relationship with the Company, or alter the terms of any relationship with the Company to the disadvantage of the Company*.

(ii) Contractor agrees that, during the term of this Agreement and for a period of one (1) year following the expiration of this Agreement, Contractor and *Contractor's agents and representatives shall not, directly or indirectly, entice, induce, or solicit any person who is or shall be an agent, contractor, or employee of the Company for the purpose of enticing or inducing such person to terminate his or her relationship with the Company*.

> ***Contractor acknowledges and agrees that the Company would be irreparably damaged if any provision of this Paragraph 7 is not performed or adhered to by Contractor*** in accordance with the specific terms hereof or is otherwise breached. Accordingly, it is agreed that the ***Company shall be entitled to an injunction or injunctions to prevent breaches of this Paragraph 7 by Contractor and shall have the right to specifically enforce this Paragraph 7*** and the terms and provisions hereof against Contractor in addition to any other remedy to which the Company may be entitled hereunder, whether at law or in equity.

9. **Validity.** If, for any reason, any provision of this Agreement is determined to be unlawful, invalid, or unenforceable, the validity and effect of all other provisions will not be affected and the unlawful, invalid, or unenforceable provision shall be revised in the most limited way possible to render the provision valid and enforceable.

(See **Exhibit 3**). (Emphasis added).

51.    The Agreement was executed by Sobota as CEO of BlueOtter.

52.    In drafting the Agreement, Guardian, Sobota, and Terhorst specifically contemplated, and were aware that, the confidentiality, non-compete, and non-solicitation provisions were intended to be applicable to Sobota and Terhorst as the primary agents and representatives of BlueOtter. The intentional inclusion of the phrase/terms "agents and representatives" throughout the Agreement is a direct outcome of Guardian's concern about the utilization of its confidential and proprietary information, which was expressed to Sobota and Terhorst on numerous occasions, and Sobota's and Terhorst's ability to compete with Guardian as a result thereof.

53.    Upon information and belief, the parties had legal representation at the time the Agreement was executed.

54.     For the first few months, the business relationship seemed to work well. Terhorst handled the financial and accounting aspects of Guardian's operations, and Sobota re-inserted himself into the field labeling services business.

55.     At Sobota's suggestion, Guardian hired a man by the name of Nick Bauer ("Bauer") to take his place as a Field Labeling Technician.  Sobota partially trained Bauer utilizing the skills and experience he obtained while working for Guardian.

56.     Bauer was a sufficient replacement for Sobota who proved to be a motivated and skilled individual and who became a valuable member of the team and generated significant business for the company.

57.     Sobota and Terhorst created passwords, were given passwords, and had access to Guardian's computer systems to obtain financials, customer lists, accounts, open jobs, accounts receivable, accounts payable, and company revenue and expenses.

58.     Sobota and Terhorst were given access to customer lists and other sensitive Field Labeling Department processes, including the Formula, which was more expansive than the information provided to Sobota when he previously worked for Guardian as a Field Labeling Technician.

59.     Both Sobota and Terhorst were given access to Guardian's computer systems and share drive, which contained confidential and proprietary information, including the Formula, to be accessed and utilized for the sole benefit of Guardian.

60.     As time went on, Guardian realized the expansive scope of information that Sobota and Terhorst were given access to and became increasingly uneasy about sharing so much confidential and proprietary information with an independent contractor.

## Amendment to the Service Agreement

61.     Sobota's access to confidential and proprietary information, along with his prior work experience and knowledge gained from working for Guardian, made him precarious. If he were to take such knowledge and information and utilize it, he would be able to compete with Guardian by using its customer lists and Formula to outbid Guardian. If Guardian lost the field labeling business because it could not compete in the industry, the company would cease to exist.

62.     Due to these realistic concerns, the parties returned to the negotiating table and executed an Amendment to the Service Agreement on May 5, 2017 (the "Amendment"). (See the Amendment attached as **Exhibit 4**).

63.     Guardian explained its concerns to Sobota and Terhorst over the course of several meetings and desired to increase the restriction of the confidentiality, non-compete, and non-solicitation provisions from 1 year to 7 years. The goal was to prevent Sobota and Terhorst from disclosing or using Guardian's confidential information, competing with its business, or soliciting customers or employees for a period of 7 years after the termination of the Agreement.

64.     Sobota and Terhorst understood these concerns and willingly agreed to increase the restricted term by way of the Amendment. Upon information and belief, they had legal representation at the time these negotiations with Guardian were taking place.

65.     The Amendment restates Paragraphs 6 and 7 of the Agreement to change the 1-year terms to 7-year terms relating to the confidentiality, non-compete and non-solicitation provisions. The restrictions applied to BlueOtter and its agents and representatives. (See **Exhibit 4**).

66.     The Amendment also states that "No other term, condition, or provision of the Agreement is amended or restated hereby," and "The terms, conditions, and provisions of the

Agreement not amended and restated by this Amendment shall remain valid, enforceable, and legally binding upon the parties hereto." (**Exhibit 4, ¶¶** 3 and 4).

67.     Thus, the termination date of the Agreement remained February 22, 2018.

68.     The Amendment was signed by Sobota as CEO of BlueOtter.

69.     Subsequent to the execution of the Amendment, Sobota and Terhorst continued to provide the services explained above to Guardian over the next few months. Terhorst managed the financial operations while Sobota assisted in the training of Guardian's Field Labeling Technicians.

70.     Upon information and belief, Guardian was BlueOtter's sole client.

71.     Upon information and belief, the Agreement with Guardian was BlueOtter's primary source of revenue and the primary source of the salaries for Sobota, Terhorst, and other employees of BlueOtter. Thus, Sobota and Terhorst directly benefited from and materially relied upon the Agreement with Guardian as third party beneficiaries thereof.

<u>**Solicitation of Guardian Employees**</u>

72.     From December of 2017 through February of 2018, during the term of the Agreement while receiving substantial compensation from Guardian on a monthly basis, Sobota approached Zewe, Guardian's Field Labeling Department Supervisor and Director of Business Operations, about starting a new company on several occasions. He told Zewe that he was going to establish a new company with Terhorst in the field labeling evaluation business that would directly compete with Guardian's business.

73.     Sobota was confident that the new business would be successful considering the experience he had obtained as a Field Labeling Technician for Guardian and the information he and Terhorst had obtained from Guardian during the term of the Agreement.

74.     Sobota encouraged Zewe to leave Guardian and become a founding member of Sobota's new field labeling business.

75.     Sobota knew that as the creator of the confidential and proprietary Formula and as Guardian's Field Labeling Supervisor and Director of Business Operations, Zewe would be a valuable asset in competing with Guardian in the fire-rating field labeling industry.

76.     Upon information and belief, Sobota also solicited Bauer, Guardian's most essential Field Labeling Technician, on several occasions and encouraged him to leave Guardian and become a Field Labeling Technician at Sobota and Terhorst's new company that would directly compete with Guardian in the field labeling business.

77.     The solicitations of Guardian employees by Sobota were done discreetly without the knowledge of Guardian and in violation of the non-solicitation provision in the Agreement and Amendment.

78.     Upon information and belief, Terhorst had knowledge of and/or was involved in the solicitations of Zewe and Bauer, Guardian employees, for a new competing business to be established by Sobota and himself.

79.     At this time, it is unknown if any other employees were solicited by Sobota or Terhorst.

80.     At the time these solicitations were made by agents and representatives of BlueOtter to Guardian employees, the Agreement and the Amendment thereto was still in effect and BlueOtter and its representatives were still providing services set forth in the Agreement to Guardian.

## Expiration of the Service Agreement

81.     As the expiration date of the Agreement approached, Guardian's board of directors (the "Board") discussed whether the Agreement should be renewed for another term.

82.     Over the course of the initial term, the Board became increasingly alarmed by the fact that Sobota and Terhorst had access to so much confidential and proprietary information, including the Formula.

83.     Sobota had access to Guardian's customer lists and engaged in interactions with customers. He also was in charge of managing Guardian's website, and he had taken control of Guardian's administrative password for the website, which was the only way to make modifications. Guardian was not provided with administrative access to the website for an extended period of time.

84.     Terhorst inserted himself into the Guardian quoting process with customers and had knowledge of the Formula and how to apply the calculations to arrive at the quantities quoted to customers without prior approval from Guardian.

85.     Terhorst sent quotes to customers on behalf of Guardian on occasion in concert with Zewe. Terhorst had access to Guardian's customer lists, and interacted with Guardian's customers.

86.     Over time, the Board gained knowledge of the fact that Terhorst, through BlueOtter, had created programs and systems to store Guardian's financial information that were password-protected and for which the only person who knew the passwords was Terhorst. Alarmingly, Guardian was not able to access its own financial information unless it was obtained from Terhorst.

87.     To Guardian's dismay, not only had a third party business and its agents and representatives taken over sole and complete control of the company's financial and website information, but Guardian also had no way of accessing that information without BlueOtter providing it.

88.     While BlueOtter did provide some valuable services to Guardian during the term of the Agreement, Guardian determined that the value added was not worth paying $189,000+ and leaving its confidential and proprietary information exposed to, and utilized by, third parties.

89.     This cost-benefit analysis was the basis for the decision by Guardian not to renew the Agreement with BlueOtter after its automatic expiration on February 22, 2018.

90.     Guardian then relayed to Sobota and Terhorst that the Agreement with BlueOtter would not be renewed.  Sobota and Terhorst attempted to negotiate with the Board to extend the Agreement, but Guardian refused.

91.     At the time the Agreement expired, Guardian had fulfilled its obligations thereunder and paid the full amount of $189,750.00 to BlueOtter in equal monthly installments of $15,812.50 in exchange for the services provided therein.

92.     Such consideration constituted most, if not all, of BlueOtter's total revenue, enabling Sobota and Terhorst to be paid.  Accordingly, Sobota and Terhorst were genuine and direct beneficiaries of the Agreement. To that end, upon the expiration of the Agreement, Sobota alleged, in an e-mail to Guardian dated March 10, 2018, that BlueOtter may have to terminate or modify the employment status of Terhorst as BlueOtter would now be without funds to pay him.

93.     Significantly, before Guardian was able to regain control over the financial and business programs and systems that had been created by BlueOtter's representatives, Terhorst illegally accessed and retrieved confidential information on Guardian's system.

94.     On or about February 28, 2018, six (6) days after the expiration of the Agreement, Terhorst illegally accessed Guardian's computer system and stole confidential information, including customer information, quotes, pricing, and invoices with the intent to use and misappropriate such information to establish a company that would directly compete with Guardian's business in the fire-rating field labeling industry.

95.     Terhorst took this confidential information on the same date that he relayed to a Guardian board member in an e-mail that he was no longer providing services under the Agreement since it expired and was not renewed, so Terhorst was aware that the Agreement had expired at the time he stole this confidential information from Guardian.

96.     Upon information and belief, Terhorst and/or Sobota illegally accessed Guardian's system after the expiration of the Agreement and stole other confidential and proprietary information, including the Formula, with the intent to use and misappropriate such information to establish a company that would directly compete with Guardian's business in the fire-rating field labeling industry.

97.     Shortly thereafter, Guardian's administrators found forensic evidence of the improper and illegal actions performed by BlueOtter's representatives that occurred subsequent to the expiration of the Agreement.  The administrators were able to trace the electronic footprints left by the representatives of BlueOtter to determine some of the information that was accessed and stolen after the expiration of the Agreement.

98.     Upon information and belief, Sobota and/or Terhorst also accessed, copied, and/or retrieved confidential and proprietary information belonging to Guardian prior to the expiration of the Agreement with the intent to form a competing business.

## Sobota and Terhorst Establish Commonwealth Assurance

99.     On March 9, 2018, only two (2) weeks after the expiration of the Agreement, Sobota and Terhorst established a limited liability company called Commonwealth Assurance, LLC under the laws of the Commonwealth of Pennsylvania.

100.    Upon information and belief, Sobota is the President and CEO of Commonwealth Assurance and has an ownership interest in the company.

101.    Upon information and belief, Terhorst is the Director of Finance of Commonwealth Assurance and has an ownership interest in the company.

102.    According to Commonwealth Assurance's website, it provides fire-rating field labeling services, including evaluations for 20, 45, 60, 90 and 180 minute fire doors, 20 minute smoke barrier doors, protective plates, and fire door frames.
(See www.commonwealthassurance.com accessed on June 4, 2018).

103.    These are the same types of services that Guardian provides to its customers, and Sobota and Terhorst were aware that Guardian provided these types of services to its customers through their experiences working intimately with Guardian under the Agreement and prior thereto.

104.    The website also boasts that Commonwealth Assurance is an accredited field labeling business that has partnered with companies known as Certified Fire Door and C.A. Noble Field Labeling Agency ("Noble") of Maine to provide the labels that Commonwealth Assurance's Field Labeling Technicians issue upon evaluation of fire-rated products, since Commonwealth Assurance does not have its own fire testing laboratory or certification division.  Guardian's relationship with Noble extends back decades, as many relationships with industry participants do.  It is important to note that, pursuant to industry accreditation standards, without a fire testing

laboratory, Commonwealth Assurance is not authorized or licensed to perform or provide field labeling services in any form or fashion.

105.   Upon information and belief, prior to and contemporaneously with the formation of Commonwealth Assurance, Sobota and Terhorst directly solicited Zewe, Guardian's Field Labeling Supervisor and Director of Business Operations, and Bauer, Guardian's Field Labeling Technician, and made multiple attempts to entice them to leave Guardian to work for their new competing business.

106.   Sobota and Terhorst, as representatives of Commonwealth Assurance, directly solicited Guardian's employees with the intent to compete with its field labeling business in violation of the non-solicitation and non-competition provisions of the Agreement and Amendment.

### Solicitation of Guardian's Customers

107.   On or about April 30, 2018, only 2 months after the Agreement had expired, Guardian received notice from a long-term and existing customer, Deronde Door of Buffalo, New York, that Commonwealth Assurance solicited business through a mass e-mail to Deronde Door and other existing and prospective customers of Guardian. Deronde Door has been a well-established customer of Guardian's for over 15 years.

108.   Upon information and belief, Sobota and Terhorst sent the e-mail blast to approximately 10,000 existing and prospective customers of Guardian.

109.   Upon information and belief, the knowledge of these customers and their contact information was obtained by Sobota and Terhorst from the misappropriation of Guardian's confidential information during and after the expiration of the Agreement for their own benefit

and use in establishing a new competing business in violation of the confidentiality and non-competition provisions of the Agreement and the Amendment.

110.    The purpose of the mass e-mail was to promote Commonwealth Assurance's fire door re-certification and field labeling services and entice potential customers to request a quote, stating, "Is your Fire Door Program out of Compliance? Commonwealth Assurance is a modern field labeling and inspection service provider. By utilizing various forms of advanced software in conjunction with strict inspection processes, we provide the 'Best in Class' product in the industry. In addition to supplying a technologically conscious product we strive to provide fast and efficient service across the United States and internationally." (See 4/30/18 solicitation e-mail attached as **Exhibit 5**).

111.    The e-mail included information regarding the field verification services provided by Commonwealth Assurance, including evaluations for 20, 45, 60, 90 and 180 minute fire doors, 20 minute smoke barrier doors, protective plates, and fire door frames. (See **Exhibit 5**). These are the same types of services that Guardian currently provides to its customers and has provided to its customers for nearly 30 years.

112.    The mass e-mail also provides a button that recipients could click on to obtain a quote from Commonwealth Assurance for any of the above-referenced services, and a phone number to contact the company.

113.    Upon information and belief, Sobota and Terhorst did not want Guardian to be aware of the mass solicitation e-mail sent on behalf of Commonwealth Assurance because Sobota and Terhorst were well aware of the contractual covenants to which they were legally bound.

114.    Guardian was notified by various existing and prospective customers and industry participants of the mass solicitation e-mail sent by Sobota and Terhorst on behalf of

Commonwealth Assurance, including, but not limited to, the Door and Hardware Institute, Deronde Door, and Kelley Brothers.

115.    Upon information and belief, various existing and prospective customers of Guardian contacted Commonwealth Assurance to obtain quotes and found that Commonwealth Assurance was pricing quotes slightly lower than Guardian.

116.    To date, it is not known as to how many existing and prospective customers of Guardian requested quotes from Commonwealth Assurance as a result of the mass e-mail, nor is it definitively known the extent to which Guardian has lost existing and prospective business to Commonwealth Assurance, though Guardian has reason to believe that Guardian's loss to date amounts to well over $100,000.

117.    Guardian soon realized that Sobota and Terhorst intended to poach their field labeling customer base by and through their new entity, Commonwealth Assurance, which could cripple Guardian's entire business. To prevent such an outcome, Guardian notified Sobota and Terhorst that it was aware of their actions in violation of the Agreement and the Amendment thereto.

118.    On May 4, 2018, Sobota participated on a conference call with Guardian's Board of Directors who informed him that they were aware of his new company, Commonwealth Assurance, and that he and Terhorst were utilizing Guardian's stolen confidential and proprietary information to actively solicit Guardian's employees and customers in violation of the confidentiality, non-solicitation, and non-competition provisions of the Agreement and the Amendment thereto. The Board requested that he and Terhorst cease and desist from all further actions in this regard.  Sobota disconnected his call with the Board without providing a response.

119.    On May 8, 2018, corporate legal counsel for Guardian followed up in writing with a cease-and-desist demand that was delivered via e-mail and regular mail to, among others, BlueOtter, Sobota, Terhorst, and Commonwealth Assurance reiterating Guardian's demand to immediately cease and desist from (a) initiating contact with existing and prospective customers of Guardian to provide field labeling and related services, (b) providing field labeling and related services to existing and prospective customers of Guardian, (c) enticing certain employees to terminate employment with Guardian and pursue employment with Commonwealth Assurance, (d) misappropriating Guardian's confidential and proprietary records and files, and (e) directly or indirectly owning, operating, or contracting with Commonwealth Assurance or any other entity in the field labeling or fire testing industries in violation of the various provisions in the Agreement and the Amendment thereto.   Guardian warned that if such actions did not immediately cease, Guardian would pursue legal and equitable relief, including, but not limited to, compensatory damages, punitive damages, specific performance, and injunctive relief against BlueOtter, Commonwealth Assurance, and Sobota and Terhorst as their primary agents and representatives. (See 5/8/18 cease and desist letter attached as **Exhibit 6**).

120.    Incredulously, on May 10, 2018, two days later, Guardian was notified by a long-term customer, Kelley Brothers, that it had received a quote from Commonwealth Assurance for the field labeling of 68 door frames in Bishop Hall at Buffalo State College in Buffalo, New York on the same day that Kelley Brothers had obtained a quote for the same job from Guardian. Commonwealth Assurance was competing for the same job on the same day as Guardian.

121.    Guardian's quote to Kelley Brothers for the evaluation of 68 openings was $3,570.00, and Commonwealth Assurance's quote for the same job was $3,400.00, a mere

difference of $170.00.   (See Guardian's quote to Kelley Brothers attached as **Exhibit 7** and Commonwealth Assurance's quote to Kelley Brothers attached as **Exhibit 8**).

122.    Kelley Brothers informed Guardian that it would do business with Guardian on this job because it had a long-standing relationship and knew that Guardian would provide quality and timely work.  However, the Kelley Brothers representative indicated that if he did not have a previously-established, long-standing relationship with Guardian, he would have engaged Commonwealth Assurance for the job since Commonwealth Assurance's quote was less than Guardian's quote.

123.    Due to the similar format of the quotes, the same factors assessed, and the slightly lower quote by Commonwealth Assurance, it is averred that Sobota and Terhorst utilized the confidential and proprietary information illegally obtained from Guardian, including the Formula, to determine how much Guardian's quote would be.  Then, Sobota and Terhorst made some minor changes to the calculations to arrive at a slightly lower number to outbid Guardian and directly compete with its business and solicit prospective and existing customers in violation of the Agreement and Amendment.

124.    Further evidence of such motives and activity was discovered by Guardian in mid-May 2018 when Guardian became aware that it was not awarded a contract for a project, known as the Westmoreland Manor project, with a long-standing customer, Acme Door and Hardware ("Acme"), due to Commonwealth Assurance's unlawfully competitive bid.

125.    Guardian had previously submitted a quote to Acme to evaluate door openings for the Westmoreland Manor project in Greensburg, Pennsylvania. Sobota and Terhorst were aware that this project was quoted to Acme because they were providing services pursuant to the Agreement at such time.

126.    Guardian came to learn that Commonwealth Assurance also submitted a quote to Acme in response to the mass e-mail sent on April 30, 2018. Sobota and Terhorst submitted the quote knowing that Guardian had not yet received approval for the job by Acme.

127.    Based on the fact that Commonwealth Assurance's quote was once again lower than Guardian's quote, Acme decided to engage Commonwealth Assurance for the job instead of Guardian.

128.    Upon information and belief, the profit from the Westmoreland Manor project amounted to approximately $20,000.

129.    Guardian was intentionally deprived of such revenue, and well over $100,000 of additional revenue, by the underhanded and unlawful actions of Sobota and Terhorst as primary agents and representatives of Commonwealth Assurance. Sobota and Terhorst utilized the confidential and proprietary information illegally obtained from Guardian, including the Formula, to know how much Guardian's quote would be.  Then, Sobota and Terhorst made some minor changes to the calculations to arrive at a slightly lower number to outbid Guardian and directly compete with its business and solicit an existing customer in violation of the Agreement and Amendment.

130.    The above facts are evidence of the improper and unlawful tactics of the Defendants about which Guardian has knowledge. It is reasonable to believe, based upon the facts and information known to Guardian, that Defendants have taken other improper and unlawful actions in furtherance of their deceitful objective to destroy Guardian's business for their own financial gain and benefit.

131.    At this time, it is not known as to how many of Guardian's prospective and existing customers Sobota and Terhorst have solicited, nor is it known how many times Sobota

and Terhorst have solicited Guardian's employees or disclosed or used Guardian's confidential and proprietary information for their own financial gain and benefit. It is not known how much business Guardian has lost, and how many contracts with prospective and existing customers Guardian has lost, due to the underhanded and unlawful tactics of the Defendants.

132.    Upon information and belief, since the formation of Commonwealth Assurance in March of 2018, it has performed, on average, 1-2 jobs per week generating approximately $2,000-$8,000 in revenue per week. If Commonwealth Assurance has been generating income in the amount of $8,000 per week, Commonwealth Assurance has been the recipient of over $100,000 in revenue from business that it unlawfully diverted from Guardian.

133.    The use of such confidential and proprietary information to interfere with Guardian's business relations with prospective and existing customers and to solicit Guardian's employees, if allowed to continue, will have a detrimental, adverse, and irreparable impact on Guardian's business. If Guardian's field labeling business is destroyed due to the actions of Defendants that render Guardian unable to compete in the industry, Guardian's entire business could be dissolved.

134.    In order to prevent such an adverse, irreparable result, Guardian has filed this action in law and equity to protect its interests and prohibit the Defendants from continuing to violate the Agreement and Amendment and intentionally destroying Guardian's business.

## COUNT I—INJUNCTIVE RELIEF
### Guardian v. All Defendants

135.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

136.    Guardian is entitled to seek injunctive relief based on the averments contained herein and pursuant to Paragraphs 6 and 7 of the Agreement and the Amendment whereby

Defendants acknowledge that Guardian will be irreparably damaged if any terms of the Agreements are breached and will be entitled to seek injunctive relief to enforce the terms of the Agreements. (**Exhibit 3, ¶¶** 6 and 7).

137.     Only by and through the issuance of an injunction can Defendants be prevented from unlawfully competing with Guardian and/or disclosing and using confidential and proprietary information belonging to Guardian to its irreparable detriment.

138.     Defendants' unlawful acts, including breaching the confidentiality, non-competition, and non-solicitation provisions of the Agreement and the Amendment; accessing, copying, transferring, retaining and utilizing Guardian's confidential and proprietary information without authorization or consent; misappropriating the trade secrets obtained from Guardian; tortiously interfering with Guardian's business relations with prospective and existing customers; soliciting Guardian's employees; and forming a company that directly competes with Guardian in the field labeling industry, have caused, and will continue to cause, immediate and irreparable harm to Guardian.

139.     Specifically, as set forth above, Guardian will suffer irreparable loss upon further disclosure and use of its highly confidential and proprietary property, including the Formula and information regarding quotes, invoices, customer lists, pricing structures, cost-benefit analyses, and profit margins.

140.     Guardian has expended considerable time and resources in developing this confidential and proprietary information, particularly the customer lists and the Formula, which are closely maintained and safeguarded and not available to the general public.

141.     Guardian has suffered damages and will continue to suffer damages, including, but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the

dissolution of the business. Accordingly, greater harm would result from denying the preliminary injunction than by granting it.

142.   In contrast, Defendants would not be harmed because preventing them from using and misappropriating confidential and proprietary information, soliciting employees, and soliciting Guardian's existing and prospective customers would be merely requiring them to adhere to the legally binding covenants in the Agreement and in accordance with applicable law. Defendants will not be harmed given that they should not have benefitted from these unlawful actions to begin with.

143.   Guardian has shown a substantial likelihood of success on the merits in this action based on the factual allegations contained herein. Further, there is no adequate remedy at law since a judgment for damages cannot compensate Guardian for the breach of the Agreement, the misappropriation and use of confidential and proprietary information, the solicitation of employees and customers, and the formation of a competing business that could be detrimental to Guardian. Accordingly, Guardian's right to relief is clear.

144.   Guardian requires preliminary injunctive relief in order to preserve the status quo and prevent further harm to Guardian pending a trial on the merits wherein permanent injunctive relief will be requested.

145.   Guardian has demonstrated, and will further demonstrate in its motion for injunctive relief and brief in support, that: (1) a reasonable probability of eventual success in the litigation; (2) that it will be irreparably injured if relief is not granted to prevent a change in the status quo; (3) greater harm will result to Guardian from denial of the injunction than will result to Defendants from granting it; and (4) that the public interest, in preventing unfair and unlawful

competition and breaches of legally binding contractual covenants, favors granting of the injunction.

146.    A preliminary injunction will eliminate the risk of further loss of business relationships and goodwill, the misappropriation and use of confidential and proprietary information, the unlawful solicitation of employees and customers, and other unascertainable injuries, losses and damages, by virtue of Defendants' unlawful acts as described herein.

147.    The public interest favors entry of an injunction in order to protect Guardian's legitimate interests under the law and the Agreement and Amendment, as well as to discourage unfair and unlawful competition and breaches of contractual covenants to which parties are bound as agents, representatives and/or beneficiaries.

148.    By virtue of the foregoing, Guardian has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

149.    Whereby, Guardian respectfully requests a Preliminary and Permanent Injunction against the Defendants, as follows:

    a.  Order BlueOtter and Commonwealth Assurance to immediately cease and desist from aiding and abetting Sobota and Terhorst in disclosing, misappropriating, and/or using Guardian's confidential and proprietary information as described herein;

    b.  Order BlueOtter, Sobota, and Terhorst to immediately cease and desist from disclosing, misappropriating, and/or using Guardian's confidential and proprietary information as described herein;

    c.  Order BlueOtter, Sobota and Terhorst to immediately return and/or destroy all confidential and proprietary information they obtained while providing services to and for Guardian;

    d.  Order Sobota and Terhorst to immediately cease and desist from directly or indirectly competing with Guardian's field labeling business through their company, Commonwealth Assurance, and any other entity;

e.  Order Sobota and Terhorst to immediately cease and desist from directly or indirectly soliciting Guardian's employees;

f.  Order Sobota and Terhorst to immediately cease and desist from directly or indirectly soliciting Guardian's prospective and existing customers;

g.  Order Commonwealth Assurance to immediately cease and desist from aiding and abetting Sobota and Terhorst by providing the resources and facilitating the solicitation of Guardian's prospective and existing customers;

h.  Order BlueOtter, Sobota, and Terhorst to immediately comply with all of the terms and conditions contained in the Agreement and the Amendment, or as appropriately limited by the Court;

i.  Order Commonwealth Assurance to cease and desist from aiding and abetting Sobota and Terhorst in breaching the terms contained in the Agreement and the Amendment;

j.  Order Commonwealth Assurance, Sobota, and Terhorst to immediately refrain from engaging, contracting with, or contacting any of Guardian's existing or prospective customers; and

k.  Any further relief this Court deems just and proper.

## COUNT II—BREACH OF CONTRACT—DUTY NOT TO DISCLOSE OR UTILIZE CONFIDENTIAL INFORMATION
### Guardian v. BlueOtter, Joshua Sobota and Dustin Terhorst

150.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

151.    The Service Agreement and the Amendment thereto are valid and legally binding contracts that were voluntarily agreed to by Guardian, BlueOtter, and its agents and representatives to further a business relationship.

152.    BlueOtter's primary agents and representatives, Sobota and Terhorst, were direct beneficiaries of the $189,000+ contract.

153.    The confidentiality provision in the Agreement and the Amendment is valid and binding, and BlueOtter and its agents and representatives agreed to regard as highly confidential

32

all information communicated to or received by them during the term of the Agreement. (**Exhibits 3 and 4**, ¶¶ 6).

154.    BlueOtter and its agents and representatives agreed to safeguard and maintain the confidentiality of all such information and agreed not to make any oral or written disclosures without Guardian's express written consent. (**Exhibits 3 and 4**, ¶¶ 6).

155.    The confidentiality provision in the Agreement applies to all information related, directly or indirectly, to Guardian's business, operations, affairs, and customers for seven (7) years after the expiration of the Agreement, which was voluntarily agreed to by Defendants while having legal representation. (**Exhibits 3 and 4**, ¶¶ 6).

156.    The purpose of the confidentiality clause is to prevent the Defendants' disclosure or use of its confidential and proprietary information to the detriment or disadvantage of Guardian and to prevent the disclosure or use of this information for Defendants' own benefit, including but not limited to, customer lists, quotes, invoices, the Formula, and other sensitive information.

157.    The confidential information obtained by Defendants during the term of the Agreement were not in the public domain or known to the public at large, and Guardian took appropriate actions to safeguard and ensure that this information was not disseminated into the public realm. This information was not readily known or easily obtainable by others.

158.    The negotiations between Guardian, BlueOtter, Sobota, and Terhorst specifically contemplated the concern that Defendants would utilize the knowledge gained from having access to Guardian's confidential information to compete with its field labeling business.

159.     The confidentiality provision includes express language binding Defendants to directly address Guardian's concerns, which were understood and acknowledged by, and voluntarily agreed to by, Defendants.

160.     The Agreement was supported by adequate and significant consideration of $189,750.00, divided into 12 monthly payments of $15,812.50, in exchange for services rendered.  (See **Exhibit 2**).

161.     Such consideration constituted most, if not all, of BlueOtter's total revenue, enabling Sobota and Terhorst to be paid.  Accordingly, Sobota and Terhorst were genuine and direct beneficiaries of the Agreement.

162.     Due to the confidential and proprietary information that Defendants had access to during the term of the Agreement, the restrictions imposed by the Agreement were reasonably necessary to protect Guardian's legitimate business interests in preventing the dissemination, disclosure, or use of its customer lists, quotes, invoices, the Formula, and other sensitive information.

163.     The covenants and restrictions in the Agreement appropriately protect Guardian's legitimate business interests.

164.     BlueOtter had a duty not to disclose or utilize Guardian's confidential and proprietary information and had a duty to ensure that this information was not disclosed or utilized by its agents or representatives for any purpose other than providing services pursuant to the Agreement and for the benefit of Guardian for seven (7) years after the expiration of the Agreement, as amended, or February 22, 2025.

165.     Sobota and Terhorst had a duty not to disclose or utilize Guardian's confidential and proprietary information for any purpose other than providing services pursuant to the

Agreement and for the benefit of Guardian for seven (7) years after the expiration of the Agreement, as amended, or February 22, 2025.

166.   Sobota and Terhorst had a duty of good faith and fair dealing that was implied in the contract with Guardian. "In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract." *Temple University Hospital, Inc. v. Group Health, Inc.*, 2006 WL 146426 at *6 (E.D. Pa. Jan. 12, 2006).

167.   "It is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor." *Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F.Supp.2d 407, 416-417 (E.D. Pa. 2013); and *AAMCO Transmissions, Inc. v. Romano*, 42 F.Supp.3d 700, 710 (E.D. Pa. 2014).

168.   Non-signatories may assume the obligations contained in contracts based on principles of contract and agency law where there is a sufficiently close relationship to justify doing so, and the circumstances warrant that result. *Invista v. Rhodia*, 625 F.3d 75 (3d Cir. 2010).

169.   BlueOtter breached the confidentiality provision in the Agreement by failing to maintain and safeguard the confidential and proprietary information obtained from Guardian before and during the restricted period set forth in the Agreement.

170.   BlueOtter breached the confidentiality provision by aiding and abetting Sobota and Terhorst, its agents or representatives, in disclosing and/or utilizing the confidential and proprietary information obtained from Guardian before and during the restricted period set forth in the Agreement.

171.     Sobota and Terhorst breached the confidentiality provision in the Agreement by failing to maintain and safeguard the confidential and proprietary information obtained from Guardian before and during the restricted period set forth in the Agreement.

172.     Sobota and Terhorst breached the confidentiality provision by disclosing and/or utilizing the confidential and proprietary information in the public realm to form a competing business for their own benefit and to the detriment of Guardian during the restricted period set forth in the Agreement.

173.     Guardian has been damaged as a consequence of Defendants' breach of the confidentiality provision in the Agreement, including but not limited to, the dissemination and use of confidential and proprietary information for their benefit and to the detriment of Guardian, damage to relationships with existing and prospective customers, loss of business from existing and prospective customers, use of confidential and proprietary information to interfere with customer relations and compete with the field labeling business, and damage to Guardian's goodwill with customers and in the industry.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against Defendants, Joshua Sobota and Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

## COUNT III—BREACH OF CONTRACT--COVENANT NOT TO COMPETE
### Guardian v. Joshua Sobota and Dustin Terhorst

174.     The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

175.     The Service Agreement and the Amendment thereto are valid and binding contracts that were voluntarily agreed to by Guardian, BlueOtter, and its agents and representatives to further an employment relationship.

176.     The non-competition provision in the Agreement and the Amendment is valid and binding and prohibits BlueOtter and its agents and representatives from directly or indirectly initiating contact with, soliciting the trade of, engaging with, or otherwise doing business with any customer or prospective customer of Guardian, other than on behalf of, or for the benefit of, Guardian. (**Exhibits 3 and 4, ¶¶ 7(i)**).

177.     The non-competition provision in the Agreement prevents BlueOtter and its agents and representatives from directly or indirectly initiating contact with any customer or prospective customer of Guardian to provide any product or service competitive with Guardian for one (1) year. (**Exhibits 3 and 4, ¶¶ 7(i)**).

178.     The negotiations between Guardian, BlueOtter, Sobota, and Terhorst specifically contemplated the concern that Sobota and Terhorst, as individuals, could utilize the knowledge gained from having access to Guardian's confidential and proprietary information to compete with its field labeling business.

179.     The non-competition restrictive covenant includes express language binding BlueOtter's agents and representatives to directly address Guardian's concerns, which were understood and acknowledged by, and voluntarily agreed to, by Sobota and Terhorst.

180.     The Agreement was supported by adequate consideration of $189,750.00, divided into 12 monthly payments of $15,812.50, in exchange for services rendered.  (See **Exhibit 2**).

181.    Such consideration constituted most, if not all, of BlueOtter's total revenue, enabling Sobota and Terhorst to be paid.  Accordingly, Sobota and Terhorst were genuine and direct beneficiaries of the Agreement.

182.    Due to the confidential and proprietary information that Sobota and Terhorst had access to during the term of the Agreement, the restrictions imposed by the Agreement were reasonably necessary to protect Guardian's legitimate business interests in preventing the dissemination, disclosure, or use of its customer lists, quotes, invoices, the Formula, and other sensitive information.

183.    The covenants and restrictions of the Agreement appropriately protect Guardian's legitimate business interests.

184.    Sobota and Terhorst had a duty not to compete with Guardian's business by providing the same or similar services or products to existing and prospective customers of Guardian for seven (7) years after the expiration of the Agreement, or until February 22, 2025.

185.    Sobota and Terhorst had a duty of good faith and fair dealing that was implied in the contract with Guardian. "In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract." *Temple University Hospital, Inc. v. Group Health, Inc.*, 2006 WL 146426 at *6 (E.D. Pa. Jan. 12, 2006).

186.    "It is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor." *Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F.Supp.2d 407, 416-417 (E.D. Pa. 2013); and *AAMCO Transmissions, Inc. v. Romano*, 42 F.Supp.3d 700, 710 (E.D. Pa. 2014).

187.    Non-signatories may assume the obligations contained in contracts based on principles of contract and agency law where there is a sufficiently close relationship to justify doing so, and the circumstances warrant that result. *Invista v. Rhodia*, 625 F.3d 75 (3d Cir. 2010).

188.    Sobota and Terhorst breached the non-competition provision in the Agreement by contemplating the formation of a new competing business, and taking specific actions in furtherance thereof, prior to the expiration of the Agreement.

189.    Sobota and Terhorst breached the non-compete provision of the Agreement by forming a new business, Commonwealth Assurance, to directly compete against Guardian in the field labeling business within a few weeks after the expiration of the Agreement during the restricted period.

190.    Further, Sobota and Terhorst breached the non-competition provision in the Agreement by directly engaging known customers of Guardian to provide products and services in the field labeling industry and offering competitive services to existing and prospective customers of Guardian within a few weeks after the expiration of the Agreement during the restricted period.

191.    Guardian has been damaged as a consequence of Sobota and Terhorst's breach of the non-competition provision in the Agreement, including but not limited to, damage to relationships with existing and prospective customers, loss of business from existing and prospective customers, use of confidential and proprietary information to interfere with customer relations and compete with the field labeling business, and damage to Guardian's goodwill with customers and in the industry.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against Defendants, Joshua Sobota and Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

## COUNT IV—BREACH OF CONTRACT--COVENANT NOT TO SOLICIT
### Guardian v. Joshua Sobota and Dustin Terhorst

192.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

193.    The Service Agreement and the Amendment thereto are valid and binding contracts that were voluntarily agreed to by Guardian, BlueOtter, and its agents and representatives to further an employment relationship.

194.    The non-solicitation provision in the Agreement and the Amendment is valid and binding and prohibits BlueOtter, and its agents and representatives from directly or indirectly initiating contact with, soliciting the trade of, engaging with, or otherwise doing business with any customer or prospective customer of Guardian, other than on behalf of, or for the benefit of, Guardian. (**Exhibits 3 and 4, ¶¶ 7(i)**).

195.    The non-solicitation provision in the Agreement prevents BlueOtter and its agents and representatives from directly or indirectly initiating contact with any customer or prospective customer of Guardian to provide any product or service competitive with Guardian for seven (7) years. (**Exhibits 3 and 4, ¶¶ 7(i)**).

196.    The non-solicitation also prohibits BlueOtter and its agents and representatives from directly or indirectly soliciting, inducing, or encouraging any customer or prospective customer of Guardian to terminate or limit any relationship, refrain from entering into a

relationship with Guardian, or alter the terms of any relationship with Guardian to the disadvantage of Guardian. (**Exhibits 3 and 4, ¶¶** 7(i)).

197.  Regarding Guardian's employees, the non-solicitation provision prohibits BlueOtter and its agents and representatives from directly or indirectly enticing, inducing, or soliciting any agent, contractor, or employee of Guardian for the purpose of terminating his or her relationship with Guardian. (**Exhibits 3 and 4, ¶¶** 7(ii)).

198.  The negotiations between Guardian, BlueOtter, Sobota, and Terhorst specifically contemplated the concern that Sobota and Terhorst, as individuals, would utilize the knowledge gained from having access to Guardian's confidential and proprietary information to solicit its existing and prospective customers and solicit Guardian's employees to work for them or a competing company in the field labeling business.

199.  The non-solicitation restrictive covenant includes express language binding BlueOtter's agents and representatives to directly address Guardian's concerns, which were understood and acknowledged by, and voluntarily agreed to by, Sobota and Terhorst.

200.  The Agreement was supported by adequate consideration of $189,750.00, divided into 12 monthly payments of $15,812.50, for services to be rendered.  (See **Exhibit 2**).

201.  Such consideration constituted most, if not all, of BlueOtter's total revenue, enabling Sobota and Terhorst to be paid.  Accordingly, Sobota and Terhorst were genuine and direct beneficiaries of the Agreement.

202.  Due to the confidential and proprietary information that Sobota and Terhorst had access to during the term of the Agreement, the restrictions imposed by the Agreement were reasonably necessary to protect Guardian's legitimate business interests in preventing the

interference with its existing and prospective customer relations and Guardian's relationship with its employees.

203.    The covenants and restrictions of the Agreement appropriately protect Guardian's legitimate business interests.

204.    Sobota and Terhorst had a duty not to solicit Guardian's prospective and existing customers and Guardian's employees for seven (7) years after the expiration of the Agreement, or until February 22, 2025.

205.    Sobota and Terhorst had a duty of good faith and fair dealing that was implied in the contract with Guardian. "In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract." *Temple University Hospital, Inc. v. Group Health, Inc.*, 2006 WL 146426 at *6 (E.D. Pa. Jan. 12, 2006).

206.    "It is well-established that a non-covenantor who benefits from the covenantor's relationship with a competing business must abide by the same restrictive covenant agreed to by the covenantor." *Tantopia Franchising Co., LLC v. West Coast Tans of PA, LLC*, 918 F.Supp.2d 407, 416-417 (E.D. Pa. 2013); and *AAMCO Transmissions, Inc. v. Romano*, 42 F.Supp.3d 700, 710 (E.D. Pa. 2014).

207.    Non-signatories may assume the obligations contained in contracts based on principles of contract and agency law where there is a sufficiently close relationship to justify doing so, and the circumstances warrant that result. *Invista v. Rhodia*, 625 F.3d 75 (3d Cir. 2010).

208.    Sobota and Terhorst breached the non-solicitation provision in the Agreement by contemplating the solicitation of Guardian's existing and prospective customers and Guardian's

employees through the formation of a new competing business, and taking specific actions in furtherance thereof, prior to the expiration of the Agreement.

209. Sobota and Terhorst breached the non-solicitation provision of the Agreement by forming a new business, Commonwealth Assurance, to directly solicit Guardian's existing and prospective customers and its employees within a few weeks after the expiration of the Agreement.

210. Further, Sobota and Terhorst breached the non-solicitation provision in the Agreement by directly engaging and contracting with known customers of Guardian to provide products and services in the field labeling industry and offering competitive services to customers of Guardian within a few weeks after the expiration of the Agreement.

211. Guardian has been damaged as a consequence of Sobota and Terhorst's breach of the non-solicitation provision in the Agreement, including but not limited to, damage to relationships with existing and prospective customers, damage to relationship with its employees, loss of business from existing and prospective customers, use of confidential and proprietary information to interfere with customer relations and compete with the field labeling business, and damage to Guardian's goodwill with customers and in the industry.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against Defendants, Joshua Sobota and Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

<u>COUNT V—MISAPPROPRIATION OF TRADE SECRETS</u>
**UNITED STATES DEFEND TRADE SECRETS ACT ("DTSA"), 18 U.S.C. § 1836,** *et seq.*
**Guardian v. All Defendants**

212.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

213.    As stated above, Guardian utilizes a confidential and proprietary Formula generated internally that is completely unique and tailored to its own business needs and is not known or easily obtainable by the public or third parties.

214.    The Formula and Guardian's pricing structure are trade secrets pursuant to the DTSA.

215.    The Formula includes a confidential calculation process of developing an estimation of costs, both fixed and variable, that Guardian will incur for each job, along with a proprietary pricing structure to cover costs and realize positive margins.

216.    The Formula uses mathematical algorithms to collate certain data and generate expense estimations that Guardian will incur for each job, depending on a variety of factors.

217.    The Formula is used by the Field Labeling Division to engage in a cost-benefit analysis for every job to determine whether the various expenses that are unique to each job outweigh the expected generation of revenue.

218.    The calculations comprising the Formula have been improved and perfected over time to arrive at a profit margin for each job that will provide maximum revenue benefits for Guardian.

219.    The Formula brings significant economic value to Guardian by calculating the maximum profit margin for each field labeling job, for which the division makes up approximately eighty percent (80%) of Guardian's revenue annually.

220.   The Formula is stored electronically in Guardian's private computer system in a protected file requiring usernames and passwords that only certain upper level management employees have access to, along with other consultants on an as-needed and confidential basis. Guardian has taken reasonable measures to safeguard this information.

221.   When customers and others have asked for more information pertaining to the Formula or Guardian's pricing structure, Guardian has refused to provide them with this information, stating that it is confidential and proprietary.

222.   If Guardian's Formula were to be disseminated or utilized in the field labeling industry by another person or entity to compete with its business, the competitor would be able to anticipate and determine the exact amount of Guardian's quote to a customer and then modify the numbers to provide that same customer with a slightly lower quote to outbid Guardian at every opportunity.  This would be detrimental to Guardian's business.

223.   Guardian's customer lists have been developed over many years through being involved in the field labeling business and through extensive marketing efforts to develop relationships with customers all over the United States.

224.   Guardian has spent considerable amounts of time, resources, and expenses to cultivate and maintain these relationships over many years, which has provided Guardian with significant economic value as a source of approximately eighty percent (80%) of its revenue annually.

225.   Guardian does not divulge its customer lists to anyone, and it takes reasonable measures to safeguard this confidential information through protected files on a private computer system requiring usernames and passwords that are not shared with the public, nor is this information contained in the public domain or easily accessible.

226.   If Guardian's customer lists were to be disseminated or utilized in the field labeling industry by another person or entity to compete with its business, the interference with, and loss of, its customers would be detrimental to Guardian's business.

227.   Thus, Guardian's customer lists are trade secrets pursuant to the DTSA.

228.   Guardian's confidential and proprietary information described herein are protectable as trade secrets pursuant to the DTSA.

229.   In addition, there may be other confidential and proprietary information taken by the Defendants about which Guardian is not yet aware that could further damage its business operations.

230.   Guardian was the sole and rightful owner of the trade secrets protected by the DTSA.

231.   Guardian's business would cease to exist if these trade secrets were compromised and utilized for the benefit of others and to the detriment of Guardian.

232.   BlueOtter, Sobota and Terhorst only had access to these trade secrets by virtue of their services pursuant to the Agreement.

233.   BlueOtter, Sobota, and Terhorst were required to maintain and safeguard these trade secrets and prevent dissemination and utilization pursuant to the Agreement.

234.   Commonwealth Assurance was aware of the Agreement and the confidentiality provisions protecting the trade secrets through its agents, Sobota and Terhorst, and it was aware that the trade secrets were acquired through improper means.

235.   Defendants have misappropriated these trade secrets in the following ways:

   a.   On each occasion when BlueOtter, Sobota and/or Terhorst accessed, copied, retained, removed, and/or stole Guardian's confidential and proprietary information without permission or authorization and with the knowledge that they intended to use the information to solicit the business of Guardian's existing and

      prospective customers, create a competing business, and solicit Guardian's employees in violation of the Agreement and the law, the Defendants acquired a trade secret in violation of the DTSA;

    b. On each occasion when BlueOtter, Sobota and/or Terhorst disseminated, disclosed, and/or utilized the confidential and proprietary information, which had been obtained improperly and illegally during the term of the Agreement to solicit customers and business without Guardian's permission or authorization, the Defendants used a trade secret in violation of the DTSA;

    c. On each occasion when Commonwealth Assurance, Sobota and/or Terhorst used the confidential and proprietary information to compete with Guardian's business and solicit Guardian's existing and prospective customers without Guardian's permission or authorization and with the knowledge that the information had been derived improperly in violation of the Agreement and the law, the Defendants used a trade secret in violation of the DTSA; and

    d. On each occasion when Commonwealth Assurance, Sobota and/or Terhorst used the confidential and proprietary information to compete with Guardian's business and solicit Guardian's existing and prospective customers without Guardian's permission or authorization and with the knowledge that the information had been derived during the course of a contractual employment relationship such that they had a duty to maintain the secrecy thereof, the Defendants used a trade secret in violation of the DTSA.

236.    Defendants intentionally misappropriated the trade secrets for their own benefit and to the detriment of Guardian. These trade secrets are critical to the success of Guardian's business.

237.    As a result of the acts of misappropriation, Defendants have caused present and future damages to Guardian, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

238.    In taking these actions, Defendants have acted intentionally, maliciously, or in reckless disregard of the rights or interests of Guardian such that an award of punitive damages is justified.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, BlueOtter, Joshua Sobota, Dustin Terhorst, and

Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, punitive damages, costs of suit and attorneys' fees under the DTSA, and any other relief this Court deems just and proper.

### COUNT VI—MISAPPROPRIATION OF TRADE SECRETS
### PENNSYLVANIA UNIFORM TRADE SECRETS ACT ("PUTSA"), 12 Pa. C.S. §5302
### Guardian v. All Defendants

239.   The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

240.   As stated above, Guardian utilizes a confidential and proprietary Formula generated internally that is completely unique and tailored to its own business needs and is not known or easily obtainable by the public or third parties.

241.   The Formula and Guardian's pricing structure are trade secrets pursuant to the PUTSA.

242.   The Formula includes a confidential calculation process of developing an estimation of costs, both fixed and variable, that Guardian will incur for each job, along with a proprietary pricing structure to cover costs and realize positive margins.

243.   The Formula uses mathematical algorithms to collate certain data and generate expense estimations that Guardian will incur for each job, depending on a variety of factors.

244.   The Formula is used by the Field Labeling Division to engage in a cost-benefit analysis for every job to determine whether the various expenses that are unique to each job outweigh the expected generation of revenue.

245.   The calculations comprising the Formula have been improved and perfected over time to arrive at a profit margin for each job that will provide maximum revenue benefits for Guardian.

246.     The Formula brings significant economic value to Guardian by calculating the maximum profit margin for each field labeling job, for which the division makes up approximately eighty percent (80%) of Guardian's revenue annually.

247.     The Formula is stored electronically in Guardian's private computer system in a protected file requiring usernames and passwords that only certain upper level management employees have access to, along with other consultants on an as-needed and confidential basis. Guardian has taken reasonable measures to safeguard this information.

248.     When customers and others have asked for more information pertaining to the Formula or Guardian's pricing structure, Guardian has refused to provide them with this information, stating that it is confidential and proprietary.

249.     If Guardian's Formula were to be disseminated or utilized in the field labeling industry by another person or entity to compete with its business, the competitor would be able to anticipate and determine the exact amount of Guardian's quote to a customer and then modify the numbers to provide that same customer with a slightly lower quote to outbid Guardian at every opportunity.  This would be detrimental to Guardian's business.

250.     Guardian's customer lists have been developed over many years through being involved in the field labeling business and through extensive marketing efforts to develop relationships with customers all over the United States.

251.     Guardian has spent considerable amounts of time, resources, and expenses to cultivate and maintain these relationships over many years, which has provided Guardian with significant economic value as a source of approximately eighty percent (80%) of its revenue annually.

252.    Guardian does not divulge its customer lists to anyone, and it takes reasonable measures to safeguard this confidential information through protected files on a private computer system requiring usernames and passwords that are not shared with the public, nor is this information contained in the public domain or easily accessible.

253.    If Guardian's customer lists were to be disseminated or utilized in the field labeling industry by another person or entity to compete with its business, the interference with, and loss of, its customers would be detrimental to Guardian's business.

254.    Thus, Guardian's customer lists are trade secrets pursuant to the PUTSA.

255.    Guardian's confidential and proprietary information described herein are protectable as trade secrets pursuant to the PUTSA.

256.    In addition, there may be other confidential and proprietary information taken by the Defendants about which Guardian is not yet aware that could further damage its business operations.

257.    Guardian was the sole and rightful owner of the trade secrets protected by the PUTSA.

258.    Guardian's business would cease to exist if these trade secrets were compromised and utilized for the benefit of others and to the detriment of Guardian.

259.    BlueOtter, Sobota and Terhorst only had access to these trade secrets by virtue of their services pursuant to the Agreement.

260.    BlueOtter, Sobota, and Terhorst were required to maintain and safeguard these trade secrets and prevent dissemination and utilization pursuant to the Agreement.

261.    Commonwealth Assurance was aware of the Agreement and the confidentiality provisions protecting the trade secrets through its agents, Sobota and Terhorst, and it was aware that the trade secrets were acquired through improper means.

262.    Defendants have misappropriated these trade secrets in the following ways:

a.  On each occasion when BlueOtter, Sobota and/or Terhorst accessed, copied, retained, removed, and/or stole Guardian's confidential and proprietary information without permission or authorization and with the knowledge that they intended to use the information to solicit the business of Guardian's existing and prospective customers, create a competing business, and solicit Guardian's employees in violation of the Agreement and the law, the Defendants acquired a trade secret in violation of the PUTSA;

b.  On each occasion when BlueOtter, Sobota and/or Terhorst disseminated, disclosed, and/or utilized the confidential and proprietary information, which had been obtained improperly and illegally during the term of the Agreement to solicit customers and business without Guardian's permission or authorization, the Defendants used a trade secret in violation of the PUTSA;

c.  On each occasion when Commonwealth Assurance, Sobota and/or Terhorst used the confidential and proprietary information to compete with Guardian's business and solicit Guardian's existing and prospective customers without Guardian's permission or authorization and with the knowledge that the information had been derived improperly in violation of the Agreement and the law, the Defendants used a trade secret in violation of the PUTSA; and

d.  On each occasion when Commonwealth Assurance, Sobota and/or Terhorst used the confidential and proprietary information to compete with Guardian's business and solicit Guardian's existing and prospective customers without Guardian's permission or authorization and with the knowledge that the information had been derived during the course of a contractual employment relationship such that they had a duty to maintain the secrecy thereof, the Defendants used a trade secret in violation of the PUTSA.

263.    Defendants intentionally misappropriated the trade secrets for their own benefit and to the detriment of Guardian. These trade secrets are critical to the success of Guardian's business.

264.     As a result of the acts of misappropriation, Defendants have caused present and future damages to Guardian, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

265.     In taking these actions, Defendants have acted intentionally, maliciously, or in reckless disregard of the rights or interests of Guardian such that an award of punitive damages is justified.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, BlueOtter, Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, punitive damages, costs of suit and attorneys' fees under the PUTSA, and any other relief this Court deems just and proper.

### COUNT VII—VIOLATION OF UNITED STATES COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030, *et al.*
### Guardian v. Dustin Terhorst

266.     The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

267.     Guardian's computers and computer system is used in or affects interstate commerce or communication because Guardian continually uses those computers and the computer system to communicate and service its customers throughout the United States. As a result, the computers and computer system to which Terhorst was provided access for use in performing his services pursuant to the Agreement is a "protected computer" within the meaning of 18 U.S.C. § 1030.

268.     Terhorst intentionally or recklessly accessed Guardian's protected computer system and removed, copied, confiscated, and/or retained confidential and proprietary files and

information both prior, during, and subsequent to the expiration of the Agreement, as described above.

269.    Terhorst accessed and retained this information without authorization or permission from Guardian who was the sole and exclusive owner of this property.

270.    Terhorst intentionally or recklessly accessed, removed, copied, confiscated, and/or retained this confidential and proprietary information with the intent to form a company that would directly compete with Guardian's field labeling business and solicit Guardian's prospective and existing customers.

271.    Terhorst accessed and utilized the confidential and proprietary information on Guardian's computer systems for his personal benefit and to the detriment of Guardian.

272.    Terhorst knew or should have known that such actions would cause harm to Guardian, and he committed these affirmative acts to intentionally cause damage to Guardian.

273.    Terhorst caused damage and loss in excess of $5,000 in a 1-year period by accessing, duplication, and utilizing Guardian's confidential and proprietary information to compete with Guardian's business. As a result, Guardian incurred expenses for internal staff to assess the extent of information accessed, transferred, or copied; to analyze the computers' activity logs, and conduct damage assessments and security breach protocols. Guardian, its Board, and other employees have invested numerous hours away from their revenue-generating work for Guardian to investigate and assess the extent of information accessed, copied, transferred, retained, and utilized by Terhorst and others.

274.    As a result of these actions, Terhorst recklessly caused damage and loss to Guardian in violation of 18 U.S.C. § 1030(a)(5)(B) and (C).

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against Defendant, Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

## COUNT VIII—CONVERSION
**Guardian v. Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance**

275.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

276.    The confidential and proprietary information described herein is the sole and exclusive property of Guardian.

277.    Defendants have no legal interest or right in this confidential and proprietary information, and they are not permitted to use or disclose this information without Guardian's consent or authorization.

278.    By accessing, retrieving, copying, removing and/or stealing this information that was on Guardian's protected computer system without its knowledge or permission, the Defendants have wrongfully deprived and/or interfered with property that is rightfully owned by Guardian for its own use without justification.

279.    The Defendants have intentionally confiscated and used this confidential and proprietary information to create a competing business and solicit its existing and prospective customers for its own benefit and to the disadvantage of Guardian.

280.    As a result of Defendant's unlawful conduct, Guardian has suffered and will continue to suffer present and future damages, including loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

### COUNT IX—TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
**Guardian v. Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance**

281.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

282.    As described herein, Guardian has maintained business relationships with myriad customers in the field labeling industry across the country for many years.

283.    Guardian has spent significant time, resources, and expenses to cultivate and develop these relationships that have been maintained over a long period of time.

284.    Kelley Brothers, Deronde Door, Acme, and the Door and Hardware Institute are just several examples of the customer relationships that Guardian has maintained over time and has continued to execute contracts with on a regular basis.

285.    As stated above, Guardian has tangible evidence that Defendants have collectively and individually interfered with these contractual relations by misappropriating customer lists and the Formula during the pendency of the Agreement in order to create a new business to compete with Guardian in the field labeling industry.

286.    Defendants sent a mass e-mail to Guardian's customers with the intent to interfere with Guardian's business relations with customers and cause customers to not enter into contracts with Guardian.

287.    Defendants have used Guardian's customer lists and proprietary information, including the Formula, to outbid Guardian on quotes to customers so that they would be enticed to do business with Defendants, rather than continue their business relationships with Guardian.

288.    Guardian is aware of at least one lost contract with Acme that it would have benefitted from if it were not for the intentional interference by Defendants.

289.    There are numerous other relationships with prospective customers of Guardian that may have been intentionally interfered with by Defendants through the mass e-mail and other underhanded tactics, but that Guardian does not have evidence or knowledge of yet.

290.    Defendants intentionally interfered with these prospective customer relations in order to prevent the relationship from occurring with Guardian.

291.    Defendants are not privileged or justified to interfere with Guardian's business relations with customers, which are protected by the Agreement.

292.    Sobota and Terhorst intentionally interfered with Guardian's contractual relations with customers for their own benefit and for the benefit of their company, Commonwealth Assurance, in order to create a company that would compete with Guardian in the field labeling industry.

293.    Commonwealth Assurance intentionally interfered with Guardian's contractual relations with customers for its own benefit and to the detriment of Guardian.

294.    As a result of Defendants' tortious interference with Guardian's business relations with customers, Guardian has suffered damages and will continue to suffer damages, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

295.    Defendants have acted intentionally, maliciously, or in a reckless disregard of the rights of Guardian for this interference with customer relationships, and they knew or should have known that such interference would cause substantial harm to Guardian.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

## COUNT X—CIVIL CONSPIRACY
### Guardian v. Joshua Sobota and Dustin Terhorst

296.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

297.    Sobota and Terhorst combined or agreed with intent to do unlawful acts or to do otherwise lawful acts by unlawful means, namely knowingly breaching the confidentiality, non-compete and non-solicitation provisions of the Agreement, misappropriating Guardian's confidential and proprietary information, and intentionally interfering with contractual relations between Guardian and its potential and existing customers of Guardian, as described herein.

298.    Sobota and Terhorst intentionally conspired to perform these unlawful acts, and took affirmative action, in furtherance thereof, by forming a company that would directly compete with Guardian in the field labeling industry, soliciting prospective and existing customers, and using its confidential and proprietary information, as described herein.

299.    Sobota and Terhorst conspired and acted with malice to perform these overt, unlawful acts for their personal benefit and with the intent to injure and harm Guardian.

300.    Guardian has been harmed by this unlawful combination and has suffered damages and will continue to suffer damages, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

301.    Defendants' actions, as alleged herein, were committed with reckless indifference to the rights of Guardian, with either the specific intent to cause harm to Guardian, or with reckless disregard to whether such actions would cause harm to Guardian.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

### COUNT XI—FRAUD
### Guardian v. Joshua Sobota and Dustin Terhorst

302.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

303.    Sobota and Terhorst represented to Guardian during contract negotiations that they desired to provide services to Guardian in order to make its business more efficient and organized and provide added benefit to Guardian.

304.    In order to do so, Sobota and Terhorst required access to Guardian's computers, computer system, and files containing confidential and proprietary information, including but not limited to customer lists and the Formula.

305.    Sobota and Terhorst represented to Guardian that they had no intention of competing with Guardian's business, soliciting employees, or soliciting prospective and existing customers.

306.   These representations were made by Sobota and Terhorst to induce Guardian to accept the Proposal and execute the Agreement.

307.   Based on these representations, Guardian executed the Agreement, giving Sobota and Terhorst access to its computers, computer system, and the confidential and proprietary information contained therein in order to provide the services enumerated in the documents.

308.   However, these representations were made falsely because Sobota and Terhorst accessed, copied, transferred, and retained confidential and proprietary information during and subsequent to the expiration of the Agreement with the specific intent to form a new competing business, solicit Guardian's employees, solicit Guardian's prospective and existing customers, and utilize the confidential and proprietary information obtained without authorization or permission to compete with Guardian in the field labeling industry.

309.   These representations were made falsely by Sobota and Terhorst who intended to mislead Guardian in believing that they were accessing its confidential and proprietary information for its benefit in accordance with its obligations under the Agreement.

310.   In fact, Sobota and Terhorst orchestrated the entire consulting relationship with Guardian from the beginning with the specific intent to induce Guardian to execute the Agreement in order to gain access to its confidential and proprietary information, form a competing business, and solicit Guardian's employees and prospective and existing customers.

311.   Guardian was justified in relying on the representations made by Sobota and Terhorst because Guardian had a good working history with Sobota, and they appeared to present a legitimate business opportunity that would benefit all parties.

312.   As a direct and proximate result of Guardian's justified reliance on the false representations made by Sobota and Terhorst, it has suffered damages and will continue to suffer

damages, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota and Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

### COUNT XII—PROMISSORY ESTOPPEL
**Guardian v. Joshua Sobota and Dustin Terhorst**

313.    The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

314.    A promise may be enforced in order to remedy a manifest injustice.

315.    In the event it is determined that Defendants are not contractually bound for certain obligations undertaken by them pursuant to the Agreement and the Amendment, then in the alternative, Guardian avers that Defendants have benefited from their unlawful actions described herein and should be estopped from continuing to cause damage to Guardian.

316.    During negotiations of the Agreement and the Amendment, Guardian explained its concerns to Defendants, particularly Sobota and Terhorst, regarding their ability to compete with Guardian's business in the field labeling industry, solicit existing and prospective customers, solicit Guardian's employees, and utilize Guardian's confidential and proprietary information to compete with Guardian's business.

317.    Guardian explained to Defendants that it was willing to accept the Proposal and execute the Agreement and subsequently the Amendment, and make the requested payments thereunder, if Defendants promised not to compete with Guardian's business, solicit any existing

or prospective customers, solicit any of Guardian's employees, and take and/or utilize confidential and proprietary information to compete with Guardian's business.

318.   During negotiations, Defendants acknowledged Guardian's concerns and made specific promises not to compete with the field labeling business, solicit existing or prospective customers, solicit employees, and take or use confidential and proprietary information to compete with Guardian's business.

319.   Based on these promises by Defendants, Guardian engaged in a business relationship with Defendants, paid Defendants for their services, and gave them access to confidential and proprietary information, including but not limited to, customer lists and the Formula.

320.   The parties attempted to reduce their understanding of the promises made to writing in the form of the Agreement and Amendment.

321.   Due to the history between the parties and the facts asserted herein, it was reasonable for Guardian to rely on the promises made by Defendants.

322.   Defendants made such promises to Guardian with the reasonable expectation of inducing Guardian into a business relationship that would provide significant benefits to Defendants, as described herein.

323.   Such promises by Defendants did in fact induce Guardian to engage them in a business relationship, pay them significant sums of money, and provide access to confidential and proprietary information and trade secrets, as described herein.

324.   The parties took affirmative actions in furtherance of the promises made and acted pursuant to a common understanding of their obligations.

325.   Defendants broke their promises to Guardian by forming a new company that would directly compete with Guardian's field labeling business, soliciting existing and prospective customers, soliciting employees, and taking and utilizing Guardian's confidential and proprietary information to detrimentally affect Guardian's business.

326.   As a direct and proximate result of Defendant's breach of the specific promises made to Guardian, it has suffered damages and will continue to suffer damages, including but not limited to, loss of reputation, goodwill, future business opportunities, and potentially the dissolution of the business.

327.   Injustice can only be avoided by enforcement of the promises made by Defendants because monetary damages will not adequately compensate Guardian for the ways in which Defendants have detrimentally affected, and will continue to affect, Guardian's business, as described herein.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota and Dustin Terhorst, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

### COUNT XIII—UNJUST ENRICHMENT
**Guardian v. Joshua Sobota and Dustin Terhorst**

328.   The averments contained in the foregoing paragraphs are incorporated by reference as if fully set forth at length herein.

329.   In the event it is determined that Defendants are not contractually bound for certain obligations undertaken by them pursuant to the Agreement and the Amendment, then in the alternative, Guardian avers that Defendants have been unjustly enriched by their unlawful actions.

330.     Guardian provided many benefits to Sobota and Terhorst during the term of the Agreement, including the full amount of the contract, along with access to confidential and proprietary information that was not disclosed to others outside the company.

331.     Guardian conferred these benefits on Sobota and Terhorst in order for them to provide the services enumerated in the Agreement for the purpose of growing Guardian's business.

332.     Sobota, Terhorst, and Commonwealth Assurance have appreciated and used the benefits and information conferred by Guardian to form a competing business, utilize confidential and proprietary information, solicit employees, and solicit prospective and existing customers to Guardian's detriment.

333.     Defendants have continued to accept and use the benefits and information conferred by Guardian to compete with Guardian's business.

334.     Defendants have no authorization, permission, or consent of Guardian to use the benefits and information conferred, and Guardian has requested Defendants to cease using such information to their benefit and to the detriment of Guardian, but to no avail.

335.     It would be inequitable for Defendants to retain the benefits of their use of the confidential and proprietary information without payment for the value of the same.

WHEREFORE, Guardian respectfully requests that this Honorable Court grant judgment in its favor and against the Defendants, Joshua Sobota, Dustin Terhorst, and Commonwealth Assurance, and an award of actual and consequential damages in an amount to be ascertained, injunctive relief as described herein, and any other relief this Court deems just and proper.

**JURY TRIAL DEMANDED.**

Respectfully submitted:

s/Matthew J. Lautman
Matthew J. Lautman, Esquire
Pa. Id. No. 90390
Catherine S. Loeffler, Esquire
Pa. Id. No. 311667
HOUSTON HARBAUGH, P.C.
Firm Id. No. 371
Three Gateway Center
401 Liberty Avenue, 22nd Floor
Pittsburgh, PA 15222-1005
*Counsel for Plaintiff, Guardian Fire
Testing Laboratories, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 18th day of June 2018, the foregoing Complaint in Law and Equity was filed electronically with the Clerk of the Court by using the CM/ECF system and was served on counsel for Defendants by electronic mail and by U.S. First Class Mail, postage prepaid as follows:

Scott Michael Hare
The Frick Building, Suite 1806
437 Grant Street
Pittsburgh, PA 15219
scott@scottlawpgh.com
*Counsel for Defendants*

s/Matthew J. Lautman
Matthew J. Lautman